# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **TEDDY L. WATSON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv00044 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |


*I. Background and Standard of Review*


Plaintiff, Teddy L. Watson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq*. (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.


The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 1:05-cv-00044-JPJ-PMS   Document 12   Filed 03/01/06   Page 1 of 26   Pageid#: 45

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Watson filed applications for DIB and SSI on October 28, 2002, alleging disability as of October 3, 2002, based on hemochromatosis[1] and resulting chronic fatigue, joint pain, difficulty gripping objects and mental limitations.[2] (Record, ("R."), at 3, 66-68, 74, 99.) These claims were denied initially and on reconsideration. (R. at 46-48, 51, 53-55.) Watson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 56.) This hearing was held on February 18, 2004, at which Watson was represented.[3] (R. at 284-302.) By decision

[1]Hemochromatosis is a disorder that interferes with iron metabolism and results in excess iron deposits throughout the body. Excess iron first accumulates in the liver, causing liver enlargement. Then, other organs are affected. The disease may lead to the development of diabetes, skin pigment changes, cardiac problems, arthritis, testicular atrophy, cirrhosis of the liver, liver cancer, hypopituitarism, chronic abdominal pain, severe fatigue and increased risk of certain bacterial infections. Some of the damage to target organs can be reversed when hemochromatosis is detected early and treated aggressively with phlebotomy. *See* http://www.nlm.nih.gov/medlineplus/ency/article/000327.htm.

[2]These documents relating to Watson's SSI claim are not included in the record. (R. at 3.)

[3]Watson was represented by Eric Reese, a paralegal for the law firm of Browning, Lamie, & Gifford, P.C. (R. at 284, 303.)

dated April 30, 2004, the ALJ denied Watson's claims. (R. at 31-37.) After the ALJ issued his decision, Watson pursued his administrative appeals, (R. at 24-27), and by order dated June 25, 2004, the Appeals Council remanded Watson's claims to the ALJ for further consideration of his subjective complaints arising from his hemochromatosis and its accompanying limitations. (R. at 59-60.) Thereafter, the ALJ held a supplemental hearing on December 7, 2004, at which Watson was again represented. (R. at 303-20.)

By decision dated January 10, 2005, the ALJ again denied Watson's claims. (R. at 14-19.) The ALJ found that Watson met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 18.) The ALJ found that Watson had not engaged in substantial gainful activity since October 3, 2002. (R. at 18.) The ALJ also found that the medical evidence established that Watson had severe impairments, namely hemochromatosis, but he found that Watson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Watson's allegations of disabling pain and other symptoms were not credible and were not supported by the evidence. (R. at 18.) The ALJ found that Watson had the residual functional capacity to perform light work.[4] (R. at 18.) Thus, the ALJ found that Watson was unable to perform his past relevant work as a construction worker and owner/working supervisor of a construction company. (R. at 18.) Based on Watson's age, education and past work history and the testimony of a vocational expert, the ALJ concluded that there were a significant

_____

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

-3-

number of jobs in the national economy that Watson could perform, including those of an estimator, a security guard, a telemarketer, a hand packer, an assembler, a sorter and an inspector. (R. at 18.) Therefore, the ALJ concluded that Watson was not under a disability as defined by the Act and was not eligible for benefits. (R. at 18-19.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued his decision, Watson pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 6-9.) Watson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on the Commissioner's motion for summary judgment filed January 3, 2006.

## *II. Facts and Analysis*

Watson was born in 1967, (R. at 66, 287, 306), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). He has a high school education with vocational training in electricity and past work experience as a construction worker and working construction supervisor. (R. at 75, 80, 287-88, 306.)

At his hearings, Watson testified that he last worked in October 2002 at a construction company owned by his wife. (R. at 288-89.) He testified that he suffered from hemochromatosis associated with extreme chronic fatigue, dizziness, inability to focus, memory difficulties, difficulty gripping objects, difficulty handling stress,

-4-

hypertension, depression, cirrhosis of the liver, heart problems and nausea in the mornings. (R. at 290, 296-99, 307.) He stated that he presented to the emergency room in April 2002 because he thought he was having a heart attack. (R. at 290-91.) However, Watson testified that he was eventually diagnosed with hemochromatosis. (R. at 291-92.) Watson stated at both hearings that he was being treated by phlebotomies every two weeks, during which a pint to a pint and a half of blood was drawn in order to decrease the amount of iron in his blood. (R. at 297-98, 311.) He testified that he would have to undergo these phlebotomies for the rest of his life. (R. at 312.) He stated that his chronic fatigue had worsened since he stopped working. (R. at 292.) At his first hearing, he testified that he did not believe he could perform even a light duty job due to difficulty with joint pain in his knees, hips, shoulders, hands and fingers from the hemochromatosis. (R. at 292-93.) At his supplemental hearing, Watson testified that he was unsure whether he could perform a light duty job. (R. at 307.) Watson testified that he had to nap throughout the day. (R. at 294.) He further testified that he had pain in his hands, especially his knuckles, difficulty gripping objects, difficulty raising his arms above his head, ankle pain, knee pain and hip pain. (R. at 312.) He further stated at his supplemental hearing that his headaches, dizziness and forgetfulness were the same or worse as at the time of his initial hearing. (R. at 313.)

Watson further testified that he had no completely pain free days. (R. at 313.) Watson also testified that he experienced depression for which his treating physician had prescribed medication. (R. at 293.) However, Watson stated at the time of his initial hearing that he had not taken this medication in a month or two due to his financial circumstances. (R. at 293.) By the time of his supplemental hearing,

Watson testified that he was seeing a mental health counselor monthly for his depression, which had worsened. (R. at 308, 312.) He further testified that his mental impairment alone would prevent him from working because he did not like being around a lot of people. (R. at 308.)

Watson testified that he helped with household chores such as laundry. (R. at 294.) He stated that he did not have any hobbies, but attended church services one to three times weekly. (R. at 294-95, 308-09.) Watson stated that he and wife would occasionally go out with friends to eat when their finances allowed. (R. at 295.) He stated that he watched television and was able to drive, noting that he took his kids to school and back, a distance of approximately 15 miles. (R. at 309-10.) He estimated that he could stand for approximately one hour. (R. at 298.) He further testified that he had difficulty bending and sitting due to hip pain. (R. at 292, 299, 307.) He testified that extreme heat caused him to nearly pass out and that extreme cold resulted in an inability to use his hands and shaking all over. (R. at 300, 310.)

Watson testified that he had been told that the damage done by the hemochromatosis was irreversible. (R. at 299, 312.) At his first hearing, he testified that he had not attended vocational rehabilitation, but by his supplemental hearing, he stated that he had seen a vocational expert. (R. at 300-01, 307.) Watson testified that he desired to resume working in the future. (R. at 300-01.)

Norman Hankins, a vocational expert, also was present and testified at Watson's supplemental hearing. (R. at 315-18.) Hankins classified Watson's past relevant work

as a construction worker as heavy[5] and semiskilled.  (R. at 315.)  He classified Watson's work as a construction supervisor as at least medium[6] and skilled.  (R. at 315.)  Hankins was asked to assume a hypothetical individual of Watson's height, weight, education and past work experience, who had the residual functional capacity to perform sedentary[7] and light work and who had an emotional disorder that did not preclude any work-related activities.  (R. at 315.)  Hankins testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a construction estimator, a security guard or gate tender, a telemarketer or customer service representative, a hand packer, an assembler, a sorter and a checker.  (R. at 315-16.)  However, Hankins testified that an individual who had to miss more than two workdays per month likely could not perform these jobs.  (R. at 317.)

In rendering his decision, the ALJ reviewed records from Dr. Clinton Sutherland, M.D.; Buchanan General Hospital; Dr. Jackie Briggs, M.D.; Dr. James Lapis, M.D.; Cardiovascular Associates; Blueridge Medical Associates; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Wellmont Holston Valley Hospital; Dr. William M. Bell III, M.D.;

---

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If someone can perform heavy work, he also can perform medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2005).

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can perform medium work, he also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

[7]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools.  *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2005).

and Robert Spangler, Ed.D., a licensed psychologist. Watson's counsel submitted additional medical records from Appalachian Rehabilitation Consultants; Dr. Sutherland; and Stone Mountain Health Services to the Appeals Council.[8]

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West

---

[8]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d) if he sufficiently explains his rationale and if the record supports his findings.

In his brief, Watson argues that the ALJ erred by finding that he could perform the full range of light work. (Brief In Support Of Plaintiff's Motion For Summary

Judgment,[9] ("Plaintiff's Brief"), at 13-16.) Specifically, Watson argues that his residual functional capacity is diminished by his severe mental impairment, which the ALJ erred by failing to find. (Plaintiff's Brief at 13-16.) Watson further argues that the ALJ erred by failing to solicit the testimony of a medical expert on remand as directed by the Appeals Council regarding his hemochromatosis and accompanying limitations. (Plaintiff's Brief at 16-17.) Watson also argues that his treatment for hemochromatosis would require him to miss more than two workdays per month, thereby precluding work. (Plaintiff's Brief at 17.)

Watson first argues that the ALJ erred by failing to find that he suffered from a severe mental impairment, thus resulting in an improper finding that he could perform the full range of light work. (Plaintiff's Brief at 13-16.) For the following reasons, I find that this argument is without merit. The regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2005). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work

---

[9]I note that Watson did not file a motion for summary judgment.

experience.'"'" 734 F.2d 1012, 1014 (4th Cir. 1984)) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), (citations omitted).

As the ALJ noted in his decision, Watson has never been hospitalized for any mental impairment. Moreover, there is very little evidence contained in the record regarding Watson's alleged mental impairment, including an assessment from Robert S. Spangler, Ed.D., a licensed psychologist, and Crystal Burke, a licensed clinical social worker at Stone Mountain Health Services, ("Stone Mountain"). However, for the reasons that follow, I find that substantial evidence supports the ALJ's failure to find that Watson suffers from a severe mental impairment.

Watson saw Spangler on February 2, 2004, for a psychological evaluation at his counsel's request. (R. at 262-67.) Spangler noted that Watson's general activity level was age and task appropriate and he appeared socially confident, but mildly depressed. (R. at 262.) Watson understood the instructions tendered, but demonstrated erratic concentration. (R. at 262.) He was appropriately persistent on the assessment tasks. (R. at 262.) Watson reported having experienced classic depression symptoms since September 2002. (R. at 263.) However, Spangler noted that Watson had received no mental health treatment. (R. at 263.)

Spangler noted that Watson was alert and fully oriented with adequate recall of remote and recent events. (R. at 263.) He opined that Watson was of low average to average intelligence. (R. at 263.) Watson denied suicidal or homicidal ideations or hallucinations, there was no evidence of delusional thinking and no indication of malingering. (R. at 263.) Spangler further noted that Watson's social skills were

-11-

adequate and he related well to him. (R. at 264.) He opined that Watson had the necessary judgment to handle his own financial affairs. (R. at 264.) Watson reported occasionally driving his children to school, making sandwiches, occasionally doing laundry and occasionally accompanying his wife to the grocery store. (R. at 264.) He further stated that he could mow his yard on a "good day," watching television daily and reading "some." (R. at 264.)

Spangler administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test, the results of which he deemed valid and reliable estimates of Watson's abilities and achievement levels. (R. at 264.) Watson obtained a verbal IQ score of 92, a performance IQ score of 92 and a full-scale IQ score of 91, placing him in the average range of intelligence. (R. at 264, 266-67.) Spangler also administered the Wide Range Achievement Test-Third Edition, ("WRAT-3"), the results of which were consistent with those of the WAIS-III. (R. at 264-67.) Watson's achievement level was placed at the high school level and his arithmetic at the eighth-grade level. (R. at 265.) Spangler diagnosed Watson with depressive disorder, not otherwise specified, mild, average intelligence with limited education reading and math skills and a then-current Global Assessment of Functioning, ("GAF"), score of 70 to 75.[10] (R. at 265.)

---

[10]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32. A GAF of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors ... no more than slight impairments in social, occupational, or school functioning. ..." DSM-IV at 32.

Case 1:05-cv-00044-JPJ-PMS   Document 12   Filed 03/01/06   Page 12 of 26   Pageid#: 56

Spangler also completed a mental assessment, indicating that Watson had an unlimited or very good ability to understand, remember and carry out simple job instructions, a good ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed job instructions and to maintain personal appearance, between a good and fair ability to deal with work stresses, to behave in an emotionally stable manner and to relate predictably in social situations, a fair ability to understand, remember and carry out complex job instructions and between a poor and no ability to demonstrate reliability. (R. at 268-70.) Spangler concluded that Watson's impairments would cause him to be absent from work more than two days per month. (R. at 270.)

The record reveals that Watson saw Burke twice, once in June 2004 and once the following month. (R. at 279-81.) On June 17, 2004, Burke noted that Watson stated that he was returning to Stone Mountain after having last been seen in July 2003, due to increasing stressors and depressive symptoms.[11] (R. at 280.) At that time, he reported having difficulty dealing with his father's suicide in February 2004. (R. at 280.) He related to Burke that his grandfather also had committed suicide several years earlier, and that he had been having recurring thoughts of death, causing him concern over his own mental health. (R. at 280.) However, he denied suicidal ideations or plans. (R. at 280.) Watson stated that he had been prescribed Zoloft by his primary care physician the previous month, which had helped "some" with his feelings of hopelessness, but noting that he continued to experience feelings of social

---

[11]Burke noted that there was no record that Watson had ever received services at Stone Mountain. (R. at 280.)

-13-

isolation, irritability and some crying spells. (R. at 280.) Burke noted that Watson was alert and oriented and related well to her. (R. at 280.) She further noted that his mood and thought content appeared depressed. (R. at 280.) Watson was encouraged to continue Zoloft and medication checks. (R. at 280.) He was diagnosed with a depressive disorder, not otherwise specified. (R. at 281.) On July 22, 2004, Watson again noted that Zoloft was helping to improve his condition. (R. at 279.) He was again alert and oriented, and his mood appeared depressed. (R. at 279.) Burke recommended that he check on having his dosage of Zoloft increased to better manage his depressive symptoms. (R. at 279.)

I find that nothing in Spangler's psychological evaluation or assessment supports a finding that Watson suffers from a severe mental impairment. In particular, he found Watson only mildly depressed, and the objective psychological testing placed Watson in the average range of intelligence. Further, Spangler placed Watson's GAF score at 70 to 75, indicating only mild and transient symptoms. Moreover, the majority of Watson's work-related mental abilities were deemed to be good. (R. at 268-69.) Likewise, Burke's treatment notes do not suggest that Watson suffers from a severe mental impairment. She saw Watson on only two occasions, during both of which Watson stated that medication was improving his depressive symptoms. It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Moreover, Burke placed no restrictions on Watson's activities. For all of these reasons, I find that substantial evidence supports the ALJ's failure to find that Watson suffered from a severe mental impairment, thereby diminishing his ability to perform light work.

-14-

Watson next argues that the ALJ erred by failing to secure medical expert testimony on remand regarding his hemochromatosis and accompanying limitations, in contravention of the Appeals Council's instructions. I first note that the Appeals Council's order, dated June 25, 2004, instructs the ALJ on remand to: "... *if necessary*, obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments. ..." (R. at 60) (emphasis added). Thus, the Appeals Council did not, contrary to Watson's argument, *require* the ALJ to obtain medical expert testimony on remand. That being said, the issue before the court is whether the ALJ had sufficient evidence in front of him from which to determine whether Watson's hemochromatosis and accompanying limitations resulted in the imposition of restrictions of a severity sufficient to deem Watson disabled. For the following reasons, I find that the ALJ had sufficient evidence before him from which to make a disability determination without the need for medical expert testimony.

The record reveals that Watson saw Dr. Clinton Sutherland, M.D., from March 16, 2002, through April 15, 2003. (R. at 142-62.) Over this time period, Watson complained of chest pain and tightness, left arm numbness, dizziness, nausea, weakness and fatigue, headaches, blurred vision, vertigo, hypertension, occasional right upper quadrant pain, right shoulder and left leg pain after falling from a ladder, low back pain and anxiety over his illness. (142-43, 147-54.) Physical examinations consistently revealed clear lungs, normal cardiac examinations and normal extremity examinations. (R. at 150-56.) On March 16, 2002, Watson exhibited a full range of motion of the extremities and no gross sensory or motor deficit was noted. (R. at 155.)

-15-

On April 19, 2002, Watson presented to the emergency department at Buchanan General Hospital with complaints of chest pain associated with nausea, sweating, chills, weakness and palpitations. (R. at 163-65.) A chest x-ray showed no acute cardiac, pulmonary or pleural pathology, and an electrocardiogram, ("EKG"), revealed a normal sinus rhythm. (R. at 166-67.) Watson was diagnosed with viral syndrome and costochondritis. (R. at 164.) A Toradol injection was administered, and he was advised to take Advil or Tylenol. (R. at 163.)

On April 20, 2002, Dr. Sutherland again diagnosed Watson with angina/costochondritis, hypertension and anxiety. (R. at 154.) He was restricted from heavy lifting at that time and was advised to take Motrin. (R. at 154.) A stress test and EKG were ordered. (R. at 154.) On April 22, 2002, Watson received another Toradol injection and was advised to take Motrin after falling from a ladder and injuring his right shoulder and left leg. (R. at 153.) An x-ray of the right shoulder, as well as one of the right ribs, showed no fracture or dislocation. (R. at 178-79.) A chest x-ray revealed clear lungs and a normal heart. (R. at 177.)

On April 26, 2002, Watson saw Dr. Jose Piriz, M.D., for an exercise stress test, at the referral of Dr. Jackie Briggs, M.D. (R. at 171-73.) The exercise stress test yielded normal results and an EKG showed only mild mitral regurgitation. (R. at 171-73.)

The following day, Dr. Sutherland noted that Watson had elevated liver function tests, ("LFTs"), and that testing would be repeated. (R. at 152.) He was prescribed Meclizine. (R. at 152.) On April 29, 2002, mild right upper quadrant

-16-

tenderness over the gallbladder was noted.  (R. at 151.)  However, there was no significant abnormality of the spine or gait.  (R. at 151.)  Watson was placed on Cozaar. (R. at 151.)  An abdominal ultrasound performed on April 30, 2002, revealed multiple gallbladder polyps.  (R. at 175, 192.)  An MRI of Watson's head was normal, and a chest x-ray showed no acute pulmonary pathology.  (R. at 176-77.)  On May 2, 2002, Janet Sloane, a family nurse practitioner, noted mild edema of the right hand and mild erythema of the right arm.  (R. at 150.)  Watson was diagnosed with phlebitis of the right arm, hypokalemia,[12] hypertension and dizziness.  (R. at 150.)  He was advised to use warm, wet compresses to the right arm and to use Motrin as needed. (R. at 150.)  The following day, Watson presented to the emergency department at Wellmont Holston Valley Hospital with complaints of chest pain, back pain and shortness of breath for the previous two weeks.  (R. at 251-53.)  He was diagnosed with chest pain.  (R. at 251.)  On August 27, 2002, Watson reported that his nausea had subsided.  (R. at 148.)

On June 14, 2002, Watson saw Dr. Harrison D. Turner, M.D., with Cardiovascular Associates, P.C., at Dr. Briggs's referral due to chest discomfort and abnormal enzymes.  (R. at 233-35.)  Watson reported mild anxiety in the past, intermittently. (R. at 233.) Dr. Tuner noted that Watson was mildly anxious, but fully oriented.  (R. at 234.)  He exhibited clear lungs and a normal cardiac examination.  (R. at 234.)  Watson's femoral and pedal pulses were 2+, and there was no evidence of cyanosis, clubbing, stasis changes or edema.  (R. at 234.)  He exhibited no kyphosis and no chest wall tenderness.  (R. at 234.)  An EKG revealed a normal sinus rhythm.

---

[12]Hypokalemia refers to an abnormally low potassium concentration in the blood. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 805 (27th ed. 1988.)

-17-

(R. at 236.)  Dr. Turner diagnosed early forms of atypical chest discomfort most consistent with a musculoskeletal origin, atypical nausea and fatigue, improving, of uncertain origin, mildly elevated serum glutamic-oxaloacetic transaminase, ("SGOT"),[13] and serum glutamate pyruvate transaminase, ("SGPT"),[14] of uncertain origin, hypertension with some lability and gallbladder polyps.  (R. at 234.)  Dr. Turner recommended symptomatic treatment for mild chest discomfort and the continuation of home blood pressure checks, noting that Watson's hypertension was well-controlled the majority of the time.  (R. at 235.)  In a letter to Dr. Briggs, Dr. Turner noted that there was a great deal of anxiety present which was responsible for Watson's blood pressure lability.  (R. at 232.)  He opined that there was no major underlying cardiovascular pathology.  (R. at 232.)

Watson saw Dr. James Lapis, M.D., on September 12, 2002, with complaints of weakness.  (R. at 188-90.)  He reported chronic fatigue since March of that year, which he described as more or less constant.  (R. at 188.)  He further reported having passed blood from the rectum on several occasions in the spring.  (R. at 188.)  Watson stated that he had some dyspnea with exertion, hypertension and weekly headaches.  (R. at 188.)  He reported no anxiety or depression.  (R. at 188.)  Dr. Lapis noted that Watson was in no acute distress and he had normal cardiac and abdominal examinations.  (R. at 189.)  Watson's peripheral pulses were intact, and there was no pedal edema of the extremities.  (R. at 189.)  He exhibited no gross neurological

---

[13]Elevated SGOT levels can be an indicator of liver disease.  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003472.htm.

[14]Elevated SGPT levels can be an indicator of liver disease.  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003473.htm.

deficits. (R. at 189.) A chest x-ray was negative. (R. at 191.) Dr. Lapis diagnosed Watson with chronic fatigue syndrome, irritable bowel syndrome, the passage of bloody stools, gallbladder polyps and erratic blood pressure, not particularly abnormal. (R. at 189.) A colonoscopy and endoscopy were recommended, and Watson was given a trial of Donnatal. (R. at 189.)

Watson again saw Dr. Lapis on October 15, 2002, with complaints of chronic fatigue, weakness, loose stools weekly and prior bloody stools. (R. at 186.) Watson again had normal cardiac and abdominal examinations. (R. at 186.) He was diagnosed with hemochromatosis without evidence of cirrhosis and was scheduled to begin phlebotomy every two weeks until a hematocrit of 34 was reached.[15] (R. at 186.) On October 30, 2002, Dr. Lapis wrote a letter stating that Watson had been diagnosed with hemochromatosis, a disorder associated with fatigue, arthritis, cirrhosis and multiple endocrine dysfunction. (R. at 185.) He further noted that, although these problems were treatable, once they occurred, they were irreversible. (R. at 185.) Thus, Dr. Lapis concluded that Watson was totally and permanently disabled. (R. at 185.)

On October 22, 2002, Dr. Sutherland noted Watson's diagnosis of hemochromatosis and recommended that he seek at least temporary disability. (R. at 146-47.) On November 11, 2002, Dr. Sutherland noted tenderness of the right anterior cervical chain and positive trigger points. (R. at 145.)

_____

[15]Hematocrit refers to the percent of whole blood that is composed of red blood cells. The hematocrit is a measure of both the number of red blood cells and the size of red blood cells. *See* http://www.nlm.nih.gov/medlineplus/ency/article/003646.htm.

Watson saw Dr. Matthew D. Beasey, M.D., with Blueridge Medical Associates, on October 28, 2002, with complaints of fatigue, nausea, swelling in the genital area, increased LFTs and lightheadedness. (R. at 238-39.) He further reported headaches, shortness of breath, pain in various joints including the arms, shoulders and hips, blurred vision, numbness and tingling in the arms and legs and occasional chest pain. (R. at 238.) He was again diagnosed with hemochromatosis. (R. at 239.)

Watson underwent a colonoscopy and endoscopy on November 14, 2002. (R. at 181.) The endoscopy revealed functional dyspepsia, but no evidence of portal hypertension. (R. at 181.) The colonoscopy revealed hemorrhoidal bleeding and erratic bowel movements, presumably spastic colon. (R. at 181.) Watson was advised to continue with the phlebotomy treatment. (R. at 181.) On March 18, 2003, Watson complained of lower back pain for the previous two days, increased with bending. (R. at 143.) A physical examination revealed tender left lumbar paraspinal muscle groups. (R. at 143.) He was diagnosed with acute lumbar strain, was prescribed Robaxin and was advised to take Motrin. (R. at 143.) On April 15, 2003, Watson was diagnosed with fibromyalgia. (R. at 142.)

On April 14, 2003, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical assessment, indicating that Watson could perform light work diminished by an ability to stand at least two hours in an eight-hour work day. (R. at 240-47.) Dr. Surrusco further found that Watson could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 243.) He imposed no manipulative, visual, communicative or environmental limitations on Watson. (R. at 243-45.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency

physician, on July 30, 2003.  (R. at 247.)

Watson again saw Dr. Sutherland on June 18, 2003.  (R. at 275.)  At that time, Dr. Sutherland again diagnosed hemochromatosis, high blood pressure, fibromyalgia and possible depression.  (R. at 275.)  He was prescribed Lexapro and was referred to Stone Mountain.  (R. at 275.)

Watson saw Dr. William M. Bell III, M.D., on September 11, 2003, at Dr. Sutherland's referral, with complaints of hand pain, shoulder pain and chronic fatigue. (R. at 259-61.)  Watson admitted to some anxiety and depression.  (R. at 260.)  A physical examination revealed no pain or compression of the chest, expansion was equal and the lungs were clear.  (R. at 260.)  He exhibited a regular heart rate and rhythm without murmur or gallop.  (R. at 260.)  Watson's peripheral pulses were equal, and there was no edema.  (R. at 260.)  He exhibited good strength in the proximal extremities, but had a decreased grip strength of 4/5 bilaterally.  (R. at 260-61.)  Straight leg raising was negative.  (R. at 259.)  Watson had good mobility of the neck and lumbar spine.  (R. at 259.)  He complained of pain with abduction and internal and external rotation of the right shoulder, but the range of motion was grossly normal and there was no crepitus noted.  (R. at 259.)  Watson's elbows and wrists showed no evidence of squeeze tenderness or soft tissue enlargement, and range of motion was normal.  (R. at 259.)  Mild soft tissue enlargement and tenderness were noted over the third proximal interphalangeal, ("PIP"), joint.  (R. at 259.)  He complained of mild soreness on compression of the second and third PIP joints of the left hand, but no soft tissue enlargement was noted.  (R. at 259.)  Watson's hip examination was normal, and he exhibited free range of motion of the knees with no

-21-

crepitus, effusions or ligamentous laxity. (R. at 259.) Watson's feet and ankles were unremarkable and his gait was normal. (R. at 259.)

Dr. Bell diagnosed Watson with arthralgias of the hands and shoulders, hemochromatosis by history and chronic fatigue. (R. at 259.) He noted that Watson did not have the typical tender points for fibromyalgia nor other findings to suggest other connective tissue disorders. (R. at 259.) However, Dr. Bell recommended that Watson undergo further testing of his sed rate, rheumatoid factor, antinuclear antibodies, ("ANA"), creatine phosphokinase, ("CPK"), and thyroid stimulating hormone, ("TSH"). (R. at 259.) Dr. Bell thereafter prescribed Prednisone. (R. at 259.)

Watson again saw Dr. Bell on October 10, 2003. (R. at 258.) Dr. Bell noted that Watson's sed rate was normal, ANA was negative, and he had a low titer rheumatoid factor, but at a level well beyond the borderline at 51.1. (R. at 258.) Watson reported that the Prednisone helped with swelling, but not with pain. (R. at 258.) A physical examination revealed clear lungs, decreased grip strength, resolved mild soft tissue enlargement over the third PIP joint of the right hand, continued soreness over the second and third metacarpophalanegal, ("MP"), joints bilaterally and soreness over the shoulders, particularly the right with abduction, internal rotation and external rotation. (R. at 258.) Watson's lower extremity joints were unremarkable. (R. at 258.) Dr. Bell prescribed Sulfasalazine, and Watson was scheduled for lab testing. (R. at 258.) Dr. Bell stated that he hoped to gradually reduce Watson's dosage of Prednisone. (R. at 258.)

-22-

As is demonstrated by the medical evidence of record, none of the medical sources, including his treating physician, placed any significant restrictions on Watson's work-related physical activities despite a clear diagnosis of hemochromatosis. Physical examinations consistently revealed no more than mild findings, and Watson was treated conservatively with medications. Likewise, various x-rays yielded normal results, as did EKGs. Thus, it appears that while Watson suffers from hemochromatosis, his abilities to perform physical work-related activities have not been diminished to a degree that would preclude the performance of light or sedentary work, as specifically found by the state agency physicians in April 2003 and July 2003. Moreover, although Dr. Lapis opined that Watson was totally and permanently disabled due to hemochromatosis, the regulations clearly reserve such findings of disability to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) (2005). Furthermore, as the Commissioner notes in her brief, Dr. Lapis's finding of disability appears to be based only on Watson's subjective allegations, not any objective medical evidence as required by the regulations. *See* 20 C.F.R. §§ 404.1528(a), 416.928(a) (2005); *see also Mickles v. Shalala*, 29 F.3d 918, 926-27 (4th Cir. 1994).

For all of these reasons, I find that the ALJ had sufficient evidence before him from which to make a disability determination, thereby precluding the necessity for the ALJ to solicit the testimony of a medical expert at Watson's supplemental hearing.

Lastly, Watson argues that because his treatment for hemochromatosis requires him to miss more than two workdays per month, all employment is precluded and he is, therefore, disabled on that basis. At Watson's supplemental hearing, the vocational

expert testified that an individual who had to miss more than two workdays each month likely would be precluded from performing any work. (R. at 317.) I first note that, contrary to the Commissioner's argument, it is not clear that Watson's phlebotomy treatments decreased in the fall of 2003. Instead, Watson specifically testified at his supplemental hearing that he continued to receive such treatment twice monthly. (R. at 311.) Moreover, in his decision, the ALJ specifically found that Watson continued to receive phlebotomies twice monthly. (R. at 16.) However, there is no evidence one way or the other as to whether these treatments lasted all day or whether Watson was able to return to work on the days that he underwent phlebotomies. That being the case, I recommend that, on remand, the ALJ be instructed to clarify the record as necessary regarding the frequency of Watson's phlebotomy treatments, the average duration of these treatment sessions and their effect on his ability to function afterwards so as to determine whether he would be required to miss more than two workdays per month, thereby precluding the performance of substantial gainful activity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence supports the ALJ's failure to find that Watson suffered from a severe mental impairment;

2.  Substantial evidence does not support the ALJ's finding that Watson retained the functional capacity to perform the full range of light work; and

3.   Substantial evidence does not support the ALJ's finding that Watson was not disabled under the Act and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand the case to the ALJ for further consideration in accordance with this Report and Recommendation.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 1993 & Supp. 2005):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and

Recommendation to all counsel of record at this time.

DATED:    This 1st day of March 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE